**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| CONGRUENT MEDIA RESOURCING LLC, <br><br> Plaintiff, <br><br> v. <br><br> ZSCALER, INC., <br><br> Defendant. | C.A. No. 3:26-cv-02654 <br><br> **JURY TRIAL DEMANDED** <br><br> **PATENT CASE** |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Congruent Media Resourcing LLC files this Original Complaint for Patent Infringement against Zscaler, Inc., and would respectfully show the Court as follows:

## I.   THE PARTIES

1.      Plaintiff Congruent Media Resourcing LLC ("Plaintiff") is a Texas limited liability company with a principal place of business located at 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

2.      On information and belief, Defendant Zscaler, Inc. ("Defendant"), is a corporation organized and existing under the laws of Delaware with a place of business at 5301 Alpha Rd, Suite 80, Dallas, Texas 75240. Defendant has a registered agent Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## II.   JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

1

4.      On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its business in this forum, including at least a portion of the infringements alleged herein. Furthermore, Defendant is subject to this Court's specific and general personal jurisdiction because Defendant maintains a place of business at 5301 Alpha Rd, Suite 80, Dallas, Texas 75240.

5.      Without limitation, on information and belief, within this state and this District, Defendant has used the patented inventions thereby committing, and continuing to commit, acts of patent infringement alleged herein.  In addition, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas and this District.  Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from services provided to persons or entities in Texas and this District. Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its providing services within Texas and this District.  Defendant has committed such purposeful acts and/or transactions in Texas and this District such that it reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

6.      Venue is proper in this district under 28 U.S.C. § 1400(b). On information and belief, Defendant maintains a place of business at 5301 Alpha Rd, Suite 80, Dallas, Texas 75240. On information and belief, from and within this District Defendant has committed at least a portion of the infringements at issue in this case.

7.       For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

### III.   <u>UNITED STATES PATENT NO. 9,135,418</u>

8.      Plaintiff incorporates the above paragraphs herein by reference.

9.      On September 15, 2015, United States Patent No. 9,135,418 ("the '418 Patent") was duly and legally issued by the United States Patent and Trademark Office.  The '418 Patent is titled "System and Method for Creating Secure Applications."  A true and correct copy of the '418 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10.      Congruent Media Resourcing LLC is the assignee of all right, title, and interest in the '418 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '418 Patent.  Accordingly, Congruent Media Resourcing LLC possesses the exclusive right and standing to prosecute the present action for infringement of the '418 Patent by Defendant.

11.      The invention in the '418 Patent relates to systems and methods for creating secure workspaces and applications, including the management and enhancement of same.  (Ex. 1 at 1:16-19).  The goal of the '418 Patent is to reduce security breaches by creating secure workspaces and applications.  (*Id.* at 1:16-38).  To do this, the '418 Patent discloses imposing functions, such as intercepts, that convert an unsecured target application to a secure application.  (*Id.* at 1:54-57). These functions may be considered as an actual replacement of existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow. (*Id.* at 1:66-2:3).  By adding these functions, the behavior of the secure application can be different from the original behavior of the target application.  (*Id.* at 1:57-61).  The '418 Patent explains that when these functions are added to the targeted application, the now secure application can be repackaged with the additional functions integrated with the original file.  (*Id.* at 2:4-6).

12.      The '418 patent provides details regarding how application securitization occurs. Specifically, it discloses that one way application wrapping may occur is via an automated process in which no source code is modified, thereby reducing programmer oversight and errors.  (*Id.* at

3

12:19-26). Additionally, the '418 patent provides examples of this, including 1) replacing references to system services with references to a library that applies the necessary mechanisms and policies and 2) inserting secure references into the code of an application to replace non secure references. (*Id.* at 12:24-35). Specifically, this securitization process may include interposing system API calls to allow a secure framework to intercept and control application functions. (*Id.* at 21:43-49). This process may further include encryption for additional protection of applications. (*Id.* at 21:49-58). One major benefit may be that management layers may be injected onto the compiled applications, removing the need for source code or developer implemented application changes. (*Id.* at 12:36-47).

13. The '418 patent also discloses technical examples of the use of securing applications. One example method is called byte code injection, which replacing byte code API calls with intercepts. (*Id.* at 22:45-51). This is particularly useful for applications formatted for the Android operating system. (*Id.*; *also* Figure 11; 23:45-60). Another disclosed technical method is to link replacement calls for native object code. (*Id.* at 22:51-57). This method is useful for applications that use native code and do not run under a virtual machine. (*Id.*). An example of this type of injection is link injection, which replaces preexisting system calls or the inclusion of new instructions in an immutable entity. (*Id.* at 24:64-25:24). The '418 Patent further discloses that linking order may be statically or dynamically linked, and that priority can be established during runtime. (*Id.* at 25:6-17). Finally, a system of obfuscation may prevent further modification or reversal of the securitization process. (*Id.* at 25:15-17).

14. The '418 patent further discusses securing target applications by overriding their behavior. Securing such an application could include programmatically injecting secure byte codes in the place of pre-existing byte codes in which the secure byte codes override the pre-

existing byte codes.  (*Id.* at 2:44-47). The term "override" means to take priority over, and the behavior of the secure application may be based on the secure byte codes instead of the pre-existing byte codes. (*Id.* at 2:47-51).  For example, a behavior of the target application associated with the pre-existing byte codes may still be executed if a policy that is associated with the secure byte codes that override the pre-existing byte codes is satisfied.  (*Id.* at 2:51-55).

15.    If the instructions in the target application are references, a target application can be secured by programmatically injecting secure references in the place of pre-existing references in which the secure references override the pre-existing references. Similar to the byte code injection above, the behavior of the secure application may be based on the secure references instead of the pre-existing references, at least until in Some cases—one or more predetermined conditions are met. (*Id.* at 2:57-64).  For example, a behavior of the target application associated with the pre existing references may still be executed if a policy that is associated with the secure references that override the pre-existing references is satisfied.  (*Id.* at 2:64-3:1), In addition, as part of the process, a linking order may be reset or overridden to enable the secure references to take precedence over the pre-existing references such that the secure references override the pre-existing references.  (*Id.* at 3:1-5).

### Asserted Claim

16.    Claim 1 of the '418 Patent claims:

A method of operating a secure application, comprising:

receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior:

in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior,

wherein the second application behavior takes priority over the first application behavior; and

via a processing unit, performing the second application behavior.

### IV.  COUNT I
### (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 9,135,418)

17.    Upon information and belief, Defendant has directly infringed claim 1 of the '418 Patent in Texas, in this District, and elsewhere in the United States, by using and performing the claimed method by using the Zscaler AI Guard ("Accused Instrumentality").

18.    **Direct Infringement**. As explained below, Zscaler AI Guard comprises a method of operating a secure application. Zscaler AI Guard is used to provide run-time protection to AI applications.  It operates a secure application by providing guardrail features that prevent certain types of attacks that may otherwise occur due to an unsecured AI application. Zscaler AI Guard evaluates AI interactions to operate a secure application by providing real time, inline protection using specialized intent-based detectors.



(*E.g.*, https://help.zscaler.com/secure-ai-users/what-ai-guard).

Artificial intelligence (AI) has rapidly become a primary interface for work as it is embedded across widely used enterprise tools, delivering on the promise to boost employee productivity. The accelerating use of AI has shifted the risk model from deterministic to probabilistic, and expands the channels through which sensitive content can be leaked or exfiltrated. Data exposure and misuse are no longer limited to structured inputs, such as files and forms. It now extends to unstructured prompts, multi-turn conversations, tool calls, model-generated outputs, and more.

As a result, new security challenges emerge that pattern-only controls struggle to reliably address. The essence of AI behavior and risk revolves around intent, context, and nondeterministic behavior.

Organizations need AI-aware guardrails capable of continuously evaluating both prompts and responses for security and policy violations with high accuracy and low latency.

Zscaler AI Guard meets this need by providing real-time, inline protection for AI interactions through specialized, intent-based detectors. Powered by task-specific AI models trained on proprietary training sets, AI Guard detectors identify and mitigate risks as they occur, ensuring safe and confident adoption of AI technologies to drive enterprise innovation.

a method of operating a secure application

(*E.g.*, https://www.zscaler.com/resources/white-papers/zscaler-ai-guard-detectors-inline-protection-for-ai.pdf).

19. Zscaler AI Guard practices the step of receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior. Architecturally, Zscaler AI Guard operates on a target application in order to activate a secure application. Target applications include, but are not limited to, public GenAI Applications, an internet facing AI chatbot, or internal AI apps and chatbots. Each of the target applications has a first set of functions associated with a first application behavior. Upon information and belief, for instance, an internal AI app or chatbot may

utilize one or more large language models and further access internal databases in an enterprise. This behavior, if uncontrolled and unsecured, may result in a first application behavior that is not secure.  Zscaler describes how this unchecked first application behavior may need to be made secure via a second application behavior (*e.g.* allowing, detecting/logging, blocking, redacting, and so on) based on organizational policy configurations.  Zscaler further describes that detection with specialized models prevent security problems such as PII exposure or prompt injection.



(*E.g.*, https://www.zscaler.com/resources/brochures/ai-runtime-protection.pdf).



(*E.g.*,        https://www.zscaler.com/resources/white-papers/zscaler-ai-guard-detectors-inline-protection-for-ai.pdf).

20.    Zscaler AI Guard practices the step of, in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior. After a request is received, AI Guard overrides the first application behavior with the second application behavior.  In the example below, a prompt is inspected and a response is also inspected.  Policy actions such as allow, detect/log, block, redact, or coach, may be applied per an organizational policy configuration. Zscaler explains how AI Guard provides second application behavior that takes priority over first application behavior.  Examples of allow, detect/log, block, redact, or coach are shown below.  Importantly, Zscaler explains how AI guardrails operate on an inline basis, which indicates how Zscaler operates on a target application's and an associated first application behavior. Zscaler explains why AI Guard is used to protect against first application behaviors.  Non limiting examples of a first application behavior that may be replaced with a second application behavior is a prompt injection or embedded code. Publicly available videos explain how AI Guard works step by step in order to determine how to operate.



9

(*E.g.*, https://www.zscaler.com/products-and-solutions/ai-guardrails).



(*E.g.*, https://www.zscaler.com/products-and-solutions/ai-guardrails).



(*E.g.*, https://www.zscaler.com/products-and-solutions/ai-guardrails).





(*E.g.*, https://www.zscaler.com/resources/brochures/ai-runtime-protection.pdf).



11

(*E.g.*, https://www.youtube.com/watch?v=y9uGIitmEB0).

21.    Zscaler AI Guard via a processing unit, performing the second application behavior. AI Guard provides an in-line, real-time system that operates to block or prevent risky prompts or AI based activities. AI Guard can provide enforcement actions which include second application behavior.  The use cases are explained in the examples below.  For instance, a prompt injection or jailbreak behavior which aims to override system rules may be blocked, redacted, or flagged before the prompt reaches the model. Publicly available videos explain the steps AI Guard takes to override with a second application behavior.

## Key Capabilities

- **Discovery and Visibility:** Automatically identifies all GenAI tools being used across the organization (including "Shadow AI") and provides a risk score for each application.

- **Data Loss Prevention (DLP):** Monitors and blocks the uploading or pasting of sensitive information—such as PII (Personally Identifiable Information), health data, or intellectual property—into AI prompts.

- **Prompt and Output Filtering:** Inspects AI interactions in real-time to block risky prompts or prevent the AI from returning malicious or inappropriate content.

performing the second application behavior

(*E.g.*, https://www.wwt.com/product/zscaler-ai-security/overview).

12

## Core AI Detectors

| DETECTOR CLASS | RISK SURFACE | USE CASE | ENFORCEMENT ACTION |
| --- | --- | --- | --- |
| Prompt Injection/Jailbreak | Attempts to override system rules, extract hidden instructions, or manipulate tools. It also flags toxicity and prompts leading to malicious outcomes. | Protect internal copilots and agentic apps from jailbreaking. | Block, redact, or flag before prompt reaches the model. |
| Toxicity/Harassment | Detects and filters harmful language related to Hate Speech, Offensive Language, Threats of Violence, Self-Harm/Suicide, Drug Use/Abuse, Sexually Explicit, Figurative/Poetic, Psychological Abuse, Coded Toxicity, Noisy Context, Misleading Benign, Toxic Denouncing, Disability Hate, Toxic Humor/Sarcasm, Mass Violence/Genocide, Toxic Mental Health Contexts, Social Media Attacks, Multilingual Toxicity. | HR/legal/comms safety, acceptable-use enforcement, customer-facing chatbots. | Suppress response or return policy-compliant substitute. |
| Intellectual Property (IP) | Safeguards private and proprietary information (IP) by automatically scanning prompts against sensitive data, flagging and blocking attempts to extract, paraphrase, or directly leak source material. | Protect sensitive content. | Redact inline or block transaction based on policy. |
| PII | Personal data entities (varies by region/policy). | Prevent employee/customer PII exposure; reduce compliance risk. | Redact inline or block transaction based on policy. |

performing the second application behavior

(*E.g.*, https://www.zscaler.com/resources/white-papers/zscaler-ai-guard-detectors-inline-protection-for-ai.pdf).



(*E.g.*, https://www.youtube.com/watch?v=ddwtuyJESQI).

22.    **Indirect Infringement**. Upon information and belief, Defendant has been and now is indirectly infringing by way of inducing infringement and contributing to the infringement of claim 1 of the '418 Patent in the State of Texas, in this District, and elsewhere in the United States, by providing the Accused Instrumentality for use as described above by Defendant's customers. Defendant advertised, offered for sale, and/or sold the Accused Instrumentality to its customers for use in a manner that Defendant knew infringed claim 1 of the '418 Patent. For example, Defendant provided marketing material advertising that the Accused Instrumentality performs the claimed method of generating a secure application from a target application designed to interact with an operating system as claimed in claim 1 of the '418 Patent.  (*Supra* ¶¶18-21 (identifying marketing materials)).

14

23.     On information and belief, since Defendant became aware of the '418 patent and the infringement at least as of the date of the service of the Original Complaint, Defendant is and has been committing the act of inducing infringement by specifically intending to induce infringement by providing the Accused Instrumentality to its customers and by aiding and abetting its use as demonstrated by the marketing materials in a manner known to infringe by Defendant. Since becoming aware of the infringing use of the Accused Instrumentality, Defendant knew that the use of the Accused Instrumentality by its customers as instructed constituted direct patent infringement. Despite this knowledge, Defendant continued to encourage and induce its customers to use the Accused Instrumentality to infringe as described above and provided instructions for using the Accused Instrumentality to infringe, including through instructional materials, support, and user's guides. Exemplary materials are cited above. (*Supra* ¶¶18-21 (identifying marketing materials)). Defendant therefore knowingly induced infringement and specifically intended to encourage and induce the infringement of the '418 Patent by its customers.

24.     On information and belief, since Defendant became aware of the infringement at least as of the date of the service of the Original Complaint, Defendant is and has been committing the act of contributory infringement by intending to provide the identified Accused Instrumentality to its customers knowing that it is a material part of the invention, knowing that its use was made and adapted for infringement of the '418 Patent, and further knowing that the accused use of the Accused Instrumentality is not a staple article or commodity of commerce suitable for substantially non-infringing use. As described above, Defendant was aware that all material claim limitations are satisfied by the use and implementation of the Accused Instrumentality by Defendant's customers in the manner described above yet continued to provide the Accused Instrumentality to its customers knowing that it is a material part of the invention. (*Supra* ¶¶18-21 (identifying

15

marketing materials)).  As described above, since learning of the infringement, Defendant knew that the use and implementation of the Accused Instrumentality by its customers was made and adapted for infringement of the '418 Patent. (*Id.*). A new act of direct infringement occurred each time a customer implemented and/or used the Accused Instrumentality in the manner described above. After Defendant became aware that the use of the Accused Instrumentality infringes at least claim 1 of the '418 Patent, Defendant knew that each such new use was made and adapted for infringement of claim 1 of the '418 Patent and Defendant continued to advertise and provide the Accused Instrumentality for such infringing activities. (*Supra* ¶¶18-21 (identifying marketing materials and videos)).  Furthermore, as described more fully above, the Accused Instrumentality has functionality designed to perform the steps in the manner described above and is therefore not a staple article or commodity of commerce suitable for substantially non-infringing use.  (*Id.*).

25.     Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such Defendant's infringement of the '418 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

26.     Unless a preliminary and permanent injunction is issued enjoining Defendant and all others acting in active concert therewith from infringing the '418 Patent, Plaintiff will be greatly and irreparably harmed.

27.     Plaintiff is only asserting a method claim and as such the marking requirements of 35 U.S.C. 287(a) do not apply. *Crown Packaging Technology, Inc. v. Rexam, Beverage Can Co.*, 559 F.3d 1308, 1316-1317 (Fed. Cir. 2009) ("Because Rexam asserted only the method claims of the '839 patent, the marking requirement of 35 U.S.C. 287(a) does not apply."); *Hanson v. Alpine*

*Valley Ski Area, Inc.*, 718 F.2d 1075, 1083 (Fed.Cir. 1983) ("It is 'settled in the case law that the notice requirement of this statute does not apply where the patent is directed to a process or method." (*Quoting Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983)). Plaintiff has therefore complied with the marking requirements 35 U.S.C. 287(a).

## V.  <u>JURY DEMAND</u>

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claim 1 of United States Patent No. 9,135,418 has been infringed and is being infringed, either literally and/or under the doctrine of equivalents, directly and/or indirectly, by Defendant;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c. That Defendants be preliminarily and permanently enjoined from any further activity or conduct that infringes;

d. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

e. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

August 10, 2026                      Respectfully Submitted,

<u>/s/Hao Ni</u>
Hao Ni
Texas Bar No. 24047205
hni@nilawfirm.com

NI, WANG & MASSAND, PLLC
8140 Walnut Hill Ln., Ste. 615
Dallas, TX 75231
Tel: (972) 331-4600
Fax: (972) 314-0900

David R. Bennett (*Pro Hac Vice to be Filed*)
Direction IP Law
P.O. Box 14184
Chicago, Illinois 60614-0184
Telephone: (312) 291-1667
dbennett@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*